IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,  )<br>                                                            )<br>            Plaintiff,          )<br>                                                            )<br>    vs.                                               )<br>                                                            )<br>GEORGE E. BANISTER, JR.,   )<br>                                                            )<br>            Defendant.             ) | Case No. 8:10CR147<br><br>FINDINGS, RECOMMENDATION,<br>AND ORDER |

This case is before the court on the defendant's Motion to Suppress (#16). The defendant moves for the suppression of a firearm and statements made by George E. Banister, Jr. The government counters that no statements were made by Banister and that the gun was admissible because it was abandoned. After hearing evidence on July 8, 2010, the court ordered the parties to submit briefs regarding Banister's standing to object to the seizure of the firearm. The final post-hearing brief was filed August 26, 2010, at which time the motion was deemed submitted.

The court recommends that the motion be denied in its entirety.

## I. FACTS

Omaha Police Officer Mickey Larson testified that, on January 31, 2010, he was operating a police cruiser with his partner, Officer John Gorden. At approximately 2:15 a.m., they were dispatched to a disturbance call of people fighting in the area of 28th Avenue and Bristol (4:18-20). After proceeding to the intersection of 28th Avenue and Bristol, Larson stopped the cruiser and rolled down his window to observe and listen. He saw three individuals walking northbound on the east side of 28th Avenue and decided to

make contact with them to see if they were involved in the disturbance or had any information of the disturbance (7:11-16).

As the officers pulled up, the individuals changed direction and moved onto a sidewalk leading to 3413 North 28th Avenue. As both Larson and Gorden exited the cruiser Larson stated, "Stop, police." The individual closest to the officers stopped, turned, and started walking back towards the officers. The next individual turned around as well and walked toward the officers. The third individual (later identified as Banister), who was closest to the residence, hurriedly ran onto the porch where he was observed trying to open the front door (8:10-22).

Larson ran past the first two individuals while Gorden stayed back. Larson observed Banister trying to open the front door, quickly turn around, and make a dropping motion. Larson heard a heavy object hit the floor of the porch. Larson then called Banister off the porch. Banister obeyed the command and moved to the sidewalk (9:12-19). Larson made Banister stand next to the others while he walked up and looked onto the porch and observed a firearm. Larson returned to Banister and placed him in handcuffs (9:20-24). Larson testified that the firearm pictured in Exhibit No. 2 was the firearm located in the corner on the north side of the porch by the entrance to the residence (10:3-9).

On cross-examination Larson testified that the photograph, Exhibit No. 2 of the firearm, was taken later after everyone was detained (11:11-14). On direct examination Larson testified that the firearm was an RG-14, a .22 caliber revolver (13:8-14). Larson

stated that he never observed anyone on the porch except Banister (14:13-17), and that he tried to get Banister to speak with him, but Banister chose not to speak (14:13-18).[1]

On cross-examination Larson testified that he first observed the three men walking in the street at approximately 2:17 in the morning (18:14-16) and that Exhibit No. 114[2] depicts the sidewalk where he first observed them (24:15-20).  Larson testified that the screen door depicted in the picture was not there on the night in question (25:8-14).

Larson testified on cross examination that he believed as he ran by the first two men toward the porch, that his partner was making the other two men lay on the sidewalk on their bellies (28:9-20).  Larson admitted that when he first observed the three men, he observed no criminal activity (28:23-25).  On redirect examination, Larson testified that the original dispatch call was an anonymous call of people fighting (33:21-23).

On recross examination, Larson denied hearing anyone say, "Stop, police, get the fuck down or I'll shoot you." (39:4-8).  Larson identified the two first two individuals as Tommy Fowler and Ronnie Cokes-Matthew (42:14-15).  Larson also identified Fowler as the brother of the owner of the residence.  Fowler and Cokes-Matthew were released at the scene and not detained, however, they were handcuffed during the detention.

Officer Jonathan Gorden testified that, at about 2:15 a.m., on January 31, 2010, he was with his partner officer Mick Larson when they responded to an anonymous call of a

---

[1] The government represents that there are no statements by Banister in the possession of the government.

[2] Defendant's Exhibits 107, 108, 111, 112, 113, 114 and 115 are photographs of the residence taken by the defendant's investigator during the first week of July 2010. Exhibit 116, a photograph depicting the house numbers and railing to the right side of the stairs, was taken by Officer Gorden on January 31, 2010.

fight disturbance on North 28th Avenue between Spencer and Bristol.  Upon arrival after four to five minutes of travel time, he observed three individuals walking.  Because he wanted to know if the individuals were involved in the disturbance or if they could provide information to assist, the individuals were approached.  Gorden could not remember what Officer Larson said, but he said, "Stop, police," (49:13-16) in a very loud manner, loud enough so all three individuals could hear.

As all three approached the sidewalk, the middle party turned and began walking toward the officers (49:20-25).  The third party made eye contact with the officers, but immediately sprinted towards the porch area (50:1-5).  Gorden noted the porch had three concrete steps and there was no door on the porch (50:6-11).

Gorden testified his primary concern was with the two individuals who stayed on the sidewalk.  After approaching them he ordered them to go to the ground and had them place their hands out to the side in an effort to provide security.  Both men were handcuffed, but were released approximately 25-30 minutes later after being patted down (52:15-24).

Gorden testified that he heard Larson call Banister down from the porch and order him to the ground.  Gordon was aware that Larson had noticed a firearm on the porch (53:1-4).  Gorden later photographed the firearm before he removed it (53:19-23). On cross-examination Gorden testified that he did not take a photograph of the entryway to the porch (63:4-6), but that there was no screen door on the porch that night (67:1-3).

Tommy Andre Fowler, testified that on January 31, 2010 he was contacted by police in front of his sister's house and that Banister had spent time at the house earlier that day

(72:3-5). He observed a police cruiser drive down the street, make a U-turn, and drive to the house. He observed officers jump out of the cruiser and tell the three individuals to lay down (73:3-6). Fowler stated that the officers said, "lay down or they were going to shoot." (74:1-3). Fowler denies the offices said, "Stop, police." (74:14-15). Fowler testified the officers had their weapons drawn when they jumped out of their car (76:1-4). Fowler said he was handcuffed. Fowler testified he saw that Banister was near the stairs, almost to the front door, when the officers told Fowler to lay down. Lying face-down, Fowler could not see whether Banister got up the stairs. (76:19-77:5). Fowler testified that his sister moved to the house in December of 2009 and that the same door as depicted in Exhibit 114 has been on the porch the entire time (79:11-22).

    On direct examination Fowler denied that while he was laying on the ground near the porch that he heard a thump coming from the front porch (82:16-18). However, he does recall the officers announcing that a weapon had been found (82:19-21). Fowler estimates the time between the individuals being made to lay on the ground and the gun being found was about five minutes or something like that (83:7-10). Fowler denies hearing any officer ordering Banister to come off the porch (83:21-24).

    Ronnie Cokes-Matthews testified that on the night in question he, along with Banister and Fowler, had arrived at the Christy Fowler residence around ten o'clock. They left the residence to attend a party in the area, and were walking back to the residence when they first observed the two cruisers – one was black and unmarked and the other was black-and-white and marked (98:9-14). Cokes testified that as he walked up to the door he heard someone say, "Don't go in the door, don't go in the house." He looked back

and observed the black cruiser and a black-and-white cruiser (99:2-9). He described the voice as a voice of authority and that as a result he stopped and turned around, observing that Tommy Fowler did the same (100:2-9). Cokes observed Banister and heard someone say get down or I'll shoot (100:17-19). Cokes observed that one of the officers had a gun pointed at them and they were told not to go into the house (101:22-24). Cokes and Fowler were ordered to lay on the ground, put their hands behind their backs, and were handcuffed. Cokes observed Banister was lying on the sidewalk next to him after previously observing Banister make it to the stairs, but not get a chance to open the door to the porch (102:20-22).

Cokes testified that he recognized the house in Exhibit 114 as Christy Fowler's and that on the night in question there was a screen door on the front of the porch (103:6-11).

Christy Fowler testified that she is the homeowner of 3413 North 28th Avenue in Omaha, Nebraska, and that she has lived at that address since November 1, 2009. Upon being shown Exhibit 114, she testified it was a picture of her front porch and that there has always been a door on the porch (112:1-25).

She testified that on January 31, 2010 she was in the house, that Banister and two other individuals had been in her home earlier, had left, and were returning when the incident occurred.

She first noticed the presence of law enforcement while looking out of her living room window. She observed three men on the ground. She then exited the front door and the officers told her to go back into the house (127:1-8). She observed police on her front porch (127:16-21). She heard someone outside her house state, "Get on the ground, get

on the ground." (128:6-7).  She looked out the window and saw the three men on the ground.  She never heard anything drop on her porch (131:12-14).

According to Christy Fowler, Banister was at her home earlier that evening along with the other two individuals.  While Banister was not an invited guest, she was aware that he was on his way to the house with others and he was welcome in her home (114:13-25).

## II.  LEGAL ANALYSIS

### A.  Suppression of Statements

Defendant moved to suppress his statements, based on his speculation that law enforcement may have obtained a statement from him in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and the Fifth Amendment to the U.S. Constitution.

The uncontroverted testimony of Officer Larson was that defendant was taken to Central Station and booked in at 3:25 a.m.  Defendant was then advised of his *Miranda* rights and refused to speak to the police. Since there is no evidence suggesting that the defendant made any statements to the police, his argument for the suppression of statements is irrelevant.

### B.  Suppression of Firearm

In response to the police officers' announcements, "Stop, police," defendant Banister hurriedly ran onto the porch of the Fowler residence and tried to open the front door.  Officer Larson then heard a heavy object hit the floor of the porch and called Banister off the porch.  Banister obeyed the command and moved to the sidewalk.  Larson then walked up and looked onto the porch, where he observed a firearm in the corner on

the north side of the porch by the entrance to the residence. Banister was then placed in custody.

In summary, Banister now argues that the firearm must be suppressed because the officers illegally entered the porch of Christy Fowler's residence. Fourth Amendment rights, however, are personal rights which may not be vicariously asserted. *Rakas v. Illinois*, 439 U.S. 128, 134 (1978). The defendant bears the burden of showing he is entitled to challenge the search of Fowler's porch.

> A defendant who "fails to prove a sufficiently close connection to the relevant places or objects searched ... has no standing to claim that they were searched or seized illegally." [*United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994).] A defendant moving to suppress evidence has the burden of showing a legitimate expectation of privacy in the area searched. *See id.* "Factors relevant to the determination of standing include: ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case." *Id.*

*United States v. Pierson*, 219 F.3d 803, 806 (8th Cir. 2000); *see also United States v. Brown*, 408 F.3d 1049, 1051 (8th Cir. 2005).

In this case, even assuming that the screen door was intact on January 31, 2010, defendant Banister has failed to demonstrate any legitimate expectation of privacy in the front porch entryway of Christy Fowler's residence.

### III.  RECOMMENDATION AND ORDER

For the reasons discussed above,

**IT IS RECOMMENDED**  that defendant's Motion to Suppress (#16) be denied in its entirety.

Pursuant to NECrimR 59.2,

**IT IS ORDERED** that a party may object to the magistrate judge's findings and recommendation by filing an "Objection to Magistrate Judge's Findings and Recommendation" within 14 days after being served with the findings and recommendation. The objecting party must comply with all requirements of NECrimR 59.2.

**DATED September 14, 2010.**

                **BY THE COURT:**

                **s/ F.A. Gossett, III**
                **United States Magistrate Judge**